**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OLD DUTCH MUSTARD CO., INC.,<br><br>Defendant. | No. 1:26-cv-00655 |

**COMPLAINT**

Plaintiff, the United States of America, by authority of the Attorney General of the United States and on behalf of the Administrator of the United States Environmental Protection Agency, by and through their undersigned attorneys, with respect to claims under federal law, allege as follows:

## I. SUMMARY OF ACTION

1. This is a civil action for injunctive relief and monetary penalties brought pursuant to Sections 309(b) and (d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b) and (d), against Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, Inc. ("Pilgrim Foods" or "Defendant").

2. The United States' claims arise from Defendant's unpermitted discharges of pollutants and failures to comply with the conditions of a permit issued to it under CWA Section 402, 33 U.S.C. § 1342, in its operation of a vinegar and mustard production facility located at 68 Old Wilton Road, Greenville, New Hampshire.

3. For decades, Defendant has regularly discharged low-pH materials, including acetic acid, into an unnamed stream (the "Stream") flowing into the Souhegan River, damaging the biological health of those waterbodies and in direct violation of the CWA. Defendant also repeatedly violated the requirements contained in Defendant's National Pollutant Discharge Elimination System ("NPDES") permit for stormwater discharges by failing to eliminate its unauthorized non-stormwater discharges and by failing to comply with numerous other requirements included in that permit to prevent and minimize water pollution.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355 and 33 U.S.C. § 1319(b).

5. Venue is proper in this district pursuant to 33 U.S.C. § 1319(b), 28 U.S.C. § 1391(b), and 28 U.S.C. § 1395(a) because Defendant is located and conducts business in this district and because the discharges at issue occurred in this district.

6. Notice of the commencement of this action has been given to the State of New Hampshire in accordance with 33 U.S.C. § 1319(b).

7. Authority to bring this action is vested in the Attorney General of the United States pursuant to 33 U.S.C. § 1366 and 28 U.S.C. § 516.

## III. DEFENDANT

8. Defendant is a corporation organized under the laws of the State of New York, with its principal place of business at 68 Old Wilton Road, Greenville, New Hampshire 03048 (the "Facility").

9. Defendant operates a vinegar and mustard production plant at the Facility.

10. Defendant is a person within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

## IV. STATUTORY AND REGULATORY AUTHORITY

11. The CWA is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

12. To accomplish those objectives, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant" by any person except in compliance with certain sections of the CWA, including, where applicable, an NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

13. Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines the term "discharge of a pollutant" as, among other things, "any addition of any pollutant to navigable waters from any point source."

14. Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, chemical wastes and industrial wastes discharged into water.

15. Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "waters of the United States . . . ."

16. Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines a "point source" as including "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged."

17. Section 402(p) of the CWA, 33 U.S.C. § 1342(p), requires a permit for stormwater discharges associated with industrial activity.

18. Section 308 of the CWA, 33 U.S.C. § 1318(a), provides that "[w]henever required to carry out the objectives" of the CWA, including but not limited to carrying out Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the United States Environmental Protection Agency "shall require the owner or operator of any point source to (i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment . . . (iv) sample such effluents . . . and (v) provide such other information as [the Administrator] may reasonably require . . . ."

19. EPA regulations define the term "storm water discharge associated with industrial activity" to include stormwater discharges from facilities involved in food preparation, including those classified as Standard Industrial Classification ("SIC") Code 2099. 40 C.F.R. § 122.26(b)(14)(xi).

20. Pursuant to CWA Section 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), and EPA's implementing regulations at 40 C.F.R. § 122.26, a stormwater discharge associated with industrial activity is prohibited except as authorized by an NPDES permit.

21. On September 29, 1995, EPA issued an NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("1995 MSGP") (60 Fed. Reg. 50804). EPA re-issued the Multi-Sector General Permit for Industrial Activities on October 30, 2000 ("2000 MSGP") (65 Fed. Reg. 64746), on September 29, 2008 ("2008 MSGP") (73 Fed. Reg. 56572), on June 16, 2015 ("2015 MSGP") (80 Fed. Reg. 34403), and on February 19, 2021 ("2021 MSGP") (86 Fed. Reg. 10269).

22. The 2015 MSGP became effective on June 4, 2015. Although the 2015 MSGP expired on June 4, 2020, it was administratively continued until March 1, 2021,

the date on which the 2021 MSGP became effective. The 2021 MSGP expired on February 28, 2026, but was administratively continued and remains in effect.

23. The MSGP regulates stormwater discharges from industrial facilities in areas where EPA is the NPDES permitting authority, as is the case in New Hampshire.

### A. MSGP Requirements

Evaluation for and Elimination of Unauthorized Non-Stormwater Discharges

24. The MSGP requires permittees to evaluate for unauthorized non-stormwater discharges and to eliminate such discharges when found. *See, e.g.*, 2015 MSGP, Part 2.1.2.9; 2021 MSGP, Part 2.1.2.9; *see also* 2015 MSGP, Part 5.2.3.4; 2021 MSGP, Part 6.2.3.4.

Control Measures to Minimize Discharges of Pollutants

25. The MSGP requires permittees to select, design, install, and implement control measures that minimize pollutants in stormwater (2015 MSGP, Part 2.1; 2021 MSGP, Part 2.1). This includes locating materials, equipment, and activities so that potential leaks and spills are contained or able to be contained or diverted before discharge (2015 MSGP, Part 2.1.2.1; 2021 MSGP, Part 2.1.2.1(b)). It also includes minimizing the potential for leaks, spills and other releases that may be exposed to stormwater, including via the use of secondary containment, and developing plans for effective responses to such spills (2015 MSGP, Part 2.1.2.4; 2021 MSGP, Part 2.1.2.4).

Corrective Actions

26. If corrective action is needed to remedy permit violations, including unauthorized discharges, permittees "must immediately take all reasonable steps necessary to minimize or prevent the discharge of pollutants until a permanent solution

is installed and made operational." *See* 2015 MSGP, Part 4.3.1; *see also* 2021 MSGP, Part 5.1.3.1.

27. If any subsequent corrective actions are necessary, permittees must take such actions within the deadlines specified in the 2015 MSGP and the 2021 MSGP. *See* 2015 MSGP, Part 4.3.2; 2021 MSGP, Part 5.1.3.2.

<u>Stormwater Pollution Prevention Plan</u>

28. The MSGP requires permittees to prepare and implement a Stormwater Pollution Prevention Plan ("SWPPP"). *See* 2015 MSGP, Part 5; 2021 MSGP, Part 6. The SWPPP must include a site map that identifies the locations of all stormwater control measures, stormwater conveyances, potential pollutant sources, significant spills or leaks as well as outfalls or discharge points. *See* 2015 MSGP, 5.2.2; 2021 MSGP, Part 6.2.2.3. In addition, the SWPPP must describe areas of the facility where industrial materials or activities are exposed to stormwater, and document where potential spills and leaks could occur that could contribute pollutants to stormwater discharges as well as the discharge points that would be affected by such spills and leaks (2015 MSGP, Parts 5.2.3.1, 5.2.3.3; 2021 MSGP Parts 6.2.3, 6.2.3.3).

<u>Annual Reports</u>

29. The MSGP requires permittees to submit Annual Reports that include any incidents of noncompliance within the last year or currently ongoing, a summary of the past year's corrective actions, and the status of any outstanding corrective actions. *See* 2015 MSGP Part 7.5; 2021 MSGP, Part 7.4 & 7.4.3).

**B. Application of MSGP to Defendant**

30. Defendant's activities fall under SIC Major Group 20, "Food and Kindred Products," specifically SIC Codes 2099, 2033, and 2035.

31. The 1995, 2000, 2008, 2015, and 2021 MSGP apply to facilities conducting activities under SIC Codes 2099, 2033, and 2035, and, therefore, the Facility. 40 C.F.R. § 122.26(b)(14)(xi).

32. Defendant has been covered by each iteration of the MSGP since January 31, 2000. For the two most recent iterations, Defendant became authorized to discharge stormwater and allowable non-stormwater under the 2015 MSGP on October 30, 2015 and under the 2021 MSGP on July 26, 2021.

## V. FACTUAL BACKGROUND

### A. The Facility

33. Defendant's Facility is located on and sits immediately north of Old Wilton Road in Greenville, New Hampshire. Defendant has been operating the Facility since about 1972.

34. At its Facility, Defendant produces vinegar and mustard for both wholesale and retail customers.

35. Defendant produces acetic acid to make its products. Vinegar is typically 5 percent acetic acid and has a typical range of 2 to 3 pH units.

36. The Facility includes a Vinegar Building (where vinegar is produced), tank farm, Mustard Building (where vinegar is mixed into various products), and production and warehousing buildings, as shown in the Site Plan included by Defendant in its SWPPP, dated December 2021. A true and accurate copy of the Site Plan is attached as Appendix A and incorporated herein.

37. The principal process at the Facility is acetification of ethanol into vinegar, which generates wastewaters containing acetic acid.

38. The Facility's front entrance is located less than 1,000 feet from the Souhegan River, a traditional navigable water that flows into the Merrimack River. The Souhegan River is one of the largest tributaries of the Merrimack River. The Merrimack River is a navigable water that flows into the Atlantic Ocean.

39. The Stream, described in Paragraph 3 and shown in Appendix A, flows through the southwest corner of the Defendant's property, mostly in underground culverts.

40. The Stream enters the property through a culvert located under a driveway and adjacent to a parking area, and briefly exits the culvert and surfaces at an "upstream access point." It then flows through another culvert below the Mustard Building, and briefly exits the culvert and surfaces again at a "downstream access point," and then flows through a culvert under Old Wilton Road and, later, to the Souhegan River.

41. As a relatively permanent tributary of the Souhegan River, the Stream is a water of the United States.

42. Stormwater associated with industrial activity runs off the western side of the Facility, including the Vinegar Building and the Mustard Building, and is partially collected in and conveyed by a conveyance system to Outfall 001. Defendants discharge this stormwater via Outfall 001 to the Stream at an inaccessible location beneath the Mustard Building.

43. The last currently accessible location in the stormwater conveyance system before it reaches Outfall 001 is a catch basin known as "CBY17," located to the north of the Mustard Building.

### B. Defendant's History of Violations

44. Defendant has a long history of stormwater-related violations of the Clean Water Act and similar violations of New Hampshire water quality requirements dating back multiple decades.

45. In 1996, following a complaint of cloudy water and low pH in the Stream, the New Hampshire Department of Environmental Services ("NH DES") confirmed a substantial drop in pH levels in the Stream as it passed beneath the Facility.

46. Fish kills, predominantly of longnose dace, were observed in September 1995 and July 1996 just downriver of where the Stream flows into the Souhegan River. NH DES concluded that those fish kills were caused by contaminants flowing from the Stream into the Souhegan River.

47. In 1998, an EPA inspection of the Facility and pH sampling of the Stream both upstream and downstream of the Facility identified significantly lower pH levels downstream of the Facility, along with evidence of biological degradation of the Stream downstream of the Facility.

#### 1. The 2004 Consent Decree

48. In 2004, the United States filed a civil action against Defendant and simultaneously lodged a consent decree (the "2004 Consent Decree") to resolve its claims that Defendant, at the Facility, had violated the Clean Water Act by, among other things, failing to apply for a stormwater permit, discharging stormwater without an NPDES permit, and discharging process water without an NPDES permit. This Court entered the 2004 Consent Decree on October 29, 2004.

49. The 2004 Consent Decree, among other things, specifically required Defendant to construct secondary containment to ensure containment of any significant

spill from a tank rupture or product transfer within the tank farm and generally required Defendant to permanently cease all unpermitted discharges.

50. Defendant has not constructed secondary containment around the tank farm and has not permanently ceased all unauthorized discharges, as further alleged herein.

51. The 2004 Consent Decree resolved only the civil judicial claims as alleged in the complaint in that action through the date of lodging of the consent decree. The 2004 Consent Decree did not otherwise limit the rights or remedies available to the United States for "any violation by Pilgrim of the Act and associated regulations or permit conditions."

52. In addition, the 2004 Consent Decree states that its provisions for stipulated penalties shall not be construed as "prohibiting, altering, or in any way limiting the ability of the United States or EPA to seek other remedies and sanctions that may be available to them by virtue of Defendant's violation(s) of this Consent Decree or of any statutes, regulations, or permits upon which the Consent Decree is based."

**2. The 2014 New Hampshire Complaint and Consent Decree**

53. In February 2014, NH DES filed a civil action alleging that Defendant had discharged or caused to be discharged and disposed of process wastewater onto the ground and into the groundwater without a New Hampshire Groundwater Discharge Permit and had unlawfully discharged process wastewater into two unlined lagoons without a permit.

54. In February 2014, the State of New Hampshire and Defendant entered into a consent decree (the "2014 Consent Decree") to resolve these allegations.

### 3. The 2014 Administrative Order

55. On March 20, 2014, EPA issued a Findings of Violation and Order for Compliance (the "Administrative Order") against Defendant after a December 2013 EPA/NH DES inspection identified low-pH product leaking from two tanks inside the tank farm area and into areas through which stormwater flows before flowing into Outfall 001 and the Stream, in violation of the 2008 MSGP.

56. The Administrative Order found that, based on the inspection and the Facility's quarterly stormwater discharge examination logs, Defendant had violated the 2008 MSGP by discharging non-stormwater pollutants (low-pH discharges) and by failing to install sufficient control measures, clean exposed areas that were potential sources of pollution, and maintain industrial equipment sufficiently to avoid leaks, spills, and other releases.

57. The Administrative Order ordered Defendant to, among other things, immediately stop discharging all stormwater mixed with non-stormwater, other than those allowable non-stormwater discharges listed in the 2008 MSGP, submit a Non-Stormwater Corrective Action Plan consistent with the 2008 MSGP, and submit a Water Quality Corrective Action Plan to control discharges of pH and other pollutants as necessary to meet New Hampshire Class B water quality standards.

58. As relevant to this Complaint, the Administrative Order required Defendant to initiate a sampling system, collecting samples from five locations, including: 1) the Facility's upstream access point to the Stream; 2) CBY17 (or another access point created to capture all the flow from the site to Outfall 001); and 3) the Facility's downstream access point to the Stream. The upstream access point, CBY17, and the downstream access point are all depicted in Appendix A.

59. The downstream access point to the Stream is located on the Facility's property after the Stream exits the culvert beneath the Mustard Building.

60. The Administrative Order required Defendant to provide pH, temperature, and specific conductivity measurements every 15 minutes from the upstream access point, CBY17, and the downstream access point for the period from April 15, 2014 through October 14, 2014, using properly calibrated sondes to conduct such monitoring, and to report the monitoring results from those sondes no later than seven days after each observation. In addition, the Administrative Order required that Defendant take acetic acid grab samples and continuously monitor pH in its stormwater drainage system and in the Stream.

61. EPA has extended Defendant's obligations to conduct the monitoring described in Paragraphs 58 and 60 through multiple superseding information requests and enforcement actions.

**4. The 2016 New Hampshire Consent Decree**

62. In May 2016, NH DES filed a petition, *State of New Hampshire Department of Environmental Services v. Old Dutch Mustard Company, Inc.*, 226-2106-cv-00221, in the Hillsborough County Superior Court, alleging violations of New Hampshire's Water Pollution and Waste Disposal Act, among other state statutes and regulations.

63. NH DES alleged that, among other things, the Defendant's unlawful discharges of low-pH water to the Stream had severely damaged the Stream's aquatic biota and habitat, to the point that it was no longer suitable for the colonization, passage, inhabitation, or reproduction of aquatic life for approximately 1,000 linear feet downstream of the Facility.

64. NH DES also alleged that, in July and August 2014, Pilgrim Foods discharged phosphoric acid solution into the Stream via a broken wastewater discharge pipe. That solution had an approximate pH of 1.06, making it a hazardous waste that Pilgrim Foods was required to immediately report and assess as to the character, exact source, amount, and areal extent of the release.

65. Shortly after filing, the State of New Hampshire and Defendant entered into a consent decree (the "2016 Consent Decree") to resolve the claims alleged by NH DES in its petition.

66. The 2016 Consent Decree, among other things, required Defendant to conduct continuous monitoring at the existing sondes at the Facility's upstream access point to the Stream, Catch Basin CBY17, and the Facility's downstream access point to the Stream for a period of five years following entry of the 2016 Consent Decree.

67. That required monitoring was in addition to both the monitoring required by EPA under the Administrative Order and the monitoring required by Defendant's MSGP permit.

68. The 2016 Consent Decree also required Defendant to hire a team of industrial, stormwater, and environmental engineers to fully assess the Facility and its operations, and to recommend corrective action to prevent future releases of product or wastes to the environment.

69. The corrective actions taken by Defendant in response to those recommendations were insufficient to prevent Defendant's recurring discharges of pollutants, which have continued regularly through the present.

### C. Defendant's Continuing Unauthorized Discharges to the Stream

70. Despite decades of known unauthorized discharges of pollutants including but not limited to process water and/or wastewater, and despite the enforcement actions by NH DES and EPA described above, Defendant continues to discharge pollutants without authorization into the Stream.

71. As described above, Defendant has performed additional monitoring— beyond the monitoring required by the MSGP— required by the Administrative Order and 2016 Consent Decree, including taking regular samples and continuously monitoring for pH at the Facility's upstream access point, at CBY17, and at the downstream access point.

72. Defendant has submitted this additional sampling and monitoring data to EPA and certified the accuracy of the submitted data.

73. The Defendant's own monitoring indicates that from November 5, 2019 through February 19, 2026 (a span of 2,298 days), an unauthorized discharge of pollutants to the Stream occurred on at least 1,728 days, amounting to approximately 75 percent of the days over this period.

74. Based on precipitation data during the period identified in Paragraph 73, at least 1,100 of the 1,728 days of identified discharges occurred on days that did not have a rain event expected to generate a stormwater discharge.

75. In response to EPA's information requests and in its submittals pursuant to the MSGP, Defendant self-reported violations on 376 days of the 1,728 identified in Paragraph 73, including descriptions of some of the circumstances or causes related to Defendant's discharges.

76. For example, over a seven-month period from late November 2019 to late June 2020, Defendant reported that an underground wastewater pipe running from the Facility's Mustard Building to the pump house was broken and leaking, causing discharges of low-pH materials into the Stream, resulting in violations on 191 days and observed pH levels as low as 2.89.

77. Defendant has reported that, on June 18 and 19, 2023, open valves allowing excessive volumes of wastewater to overflow out of the wastewater tank and a corresponding failure of secondary containment around the wastewater building resulted in discharges to the Stream. Defendants reported that these discharges resulted in observed pH levels as low as 3.28 and violations on two consecutive days.

78. Defendant reported that, on eight days between April 4 and 15, 2024, a break in the fire suppressant line sent excess water to the wastewater system, resulting in low-pH discharges to the Stream. Defendant reported observed pH levels as low as 2.76. The area of the fire suppressant line that was repaired in April 2024 was approximately eight inches away from an area of the fire suppressant line that had failed and had been repaired in 2023.

79. Defendant reported that, on January 20, 21, and 22, 2025, a lack of wastewater storage capacity due to the failure to arrange for wastewater pickups resulted in a discharge of low-pH materials into the Stream. Defendant reported observed pH levels as low as 3.43 in the stream.

80. Incorporated herein and attached hereto as Appendix B is a summary of unauthorized pollutant discharge events occurring over 376 days that were reported by Defendant as noncompliance with the MSGP, including those identified in Paragraphs 76 through 79. Appendix B includes the most extreme pH level reported in the

downstream location during each event, and Defendant's statements to EPA regarding each event.

### D. Defendant's Criminal Prosecution for Unauthorized Discharges to the Souhegan River through the Hidden Pipe

81. In approximately April or May 2015, Defendant hired a contractor to install a hidden underground pipe to transport water from the Facility to storage tanks located uphill and behind the Facility (the "Hidden Pipe"). Defendant then dismantled the water storage tanks between August 2016 and September 2017. The conduct and discharges associated with the Hidden Pipe described in this Section are the subject of a criminal prosecution and plea agreement in *United States v. Old Dutch Mustard, Inc. d/b/a Pilgrim Foods Company, et al.*, Crim. No. 1:25-00002 (D.N.H.), in which Defendant entered a guilty plea and was sentenced on April 9, 2026. This Complaint does not allege civil violations or seek civil relief related to the Hidden Pipe but includes the factual allegations in this Section because they are relevant to Defendant's compliance history, a statutory penalty factor. *See* 33 U.S.C. § 1319(d).

82. In approximately May 2017, Defendant hired the same contractor to extend the Hidden Pipe to an old, abandoned railroad bed at the top of the hill behind the Facility, with the Hidden Pipe outfall facing generally in the direction of the Souhegan River.

83. Beginning around May 2017, Defendant repeatedly pumped wastewater and acidic stormwater through the Hidden Pipe to the abandoned railroad bed. Defendant used a three-way valve to direct the wastewater and acidic stormwater that flowed through the tank farm area of the Facility either to the wastewater storage tanks at the Facility or to the Hidden Pipe to discharge this material at the top of the hill.

84. The wastewater or acidic stormwater directed to the Hidden Pipe flowed to the top of the hill, then along a manmade swale or ditch down the abandoned railroad bed toward the Souhegan River, until reaching a natural swale, a sharp dropoff, and then flowed along natural gullies to the Souhegan River.

85. Defendant attempted to conceal the Hidden Pipe by covering the end of the Hidden Pipe with dirt and brush and by directing employees to not tell anyone, including Defendant's own environmental consultant, about the Hidden Pipe.

86. In March 2021, Defendant had the same contractor install an underground sump that collected acidic stormwater flowing through the facility and pumped such stormwater up the hill through the Hidden Pipe.

87. In March 2022, Defendant rehired this contractor to clean out undergrowth from the manmade ditch at the top of the hill and line it with riprap to facilitate the flow of wastewater and acidic stormwater to the Souhegan. Defendant also modified the plumbing at the Facility to facilitate the flow of wastewater to be pumped up the hill behind the facility.

88. In May 2023, state inspectors from NH DES observed wastewater from the Facility flowing from the manmade ditch at the top of the hill behind the Facility and into the Souhegan River.

89. In August 2023, federal investigators discovered the Hidden Pipe and observed wastewater actively flowing from the Hidden Pipe at the top of the hill into the manmade ditch, which directed the wastewater into the Souhegan River. This discharge point was downstream of the conjunction of the Stream and the Souhegan River and therefore downstream of the areas where EPA and the State of New Hampshire required

Defendant to conduct continuous environmental monitoring. Thus, the required environmental monitoring would not have detected these discharges.

### E. Defendant's Repeated Failure to Comply with Numerous Requirements of the 2015 MSGP and 2021 MSGP

90. Defendant has repeatedly failed to comply with numerous requirements of the 2015 MSGP and the 2021 MSGP and continues to violate the requirements of the 2021 MSGP to this day, as detailed below.

Failure to Evaluate for Unauthorized Non-Stormwater Discharges

91. Defendant failed to evaluate for the presence of unauthorized non-stormwater discharges in violation of the 2015 MSGP and the 2021 MSGP. *See* 2015 MSGP, Part 2.1.2.9; 2021 MSGP, Part 2.1.2.9. For example, on at least 13 occasions between September 2020 and October 2023, Defendant failed to identify *any* cause for its low-pH discharges to the Stream when notifying EPA of Defendant's noncompliance with the 2015 MSGP and the 2021 MSGP. Thus, Defendant fell short of its obligation to evaluate for the presence of unauthorized non-stormwater discharges.

Failure to Eliminate Unauthorized Non-Stormwater Discharges

92. Defendant reported but failed to eliminate unauthorized non-stormwater discharges in violation of the 2015 MSGP and the 2021 MSGP. *See* 2015 MSGP, Part 2.1.2.9; 2021 MSGP, Part 2.1.2.9.

93. Appendix B of this Complaint enumerates the low-pH and high-pH events reported as noncompliance by Defendant pursuant to 2015 MSGP Appendix B.12.F and 2021 MSGP Appendix B.12.F.

94. For example, from November 23, 2019 through June 30, 2020, Defendant reported low-pH values in the Stream on 191 days out of 220 days, indicating

unauthorized stormwater and non-stormwater discharges to the Stream from the Facility on each of these 191 days (hereinafter, the "November 2019 – June 2020 Violations").

95. More recently, Defendant reported low-pH values in the Stream on 88 out of 136 days between July 2, 2024 and November 15, 2024, indicating unauthorized stormwater and non-stormwater discharges to the Stream from the Facility on each of these 88 days ("July 2024 – November 2024 Violations").

96. For each of these events, Defendant did not eliminate such discharges, as required by the MSGP, instead allowing them to continue for significant intervals.

97. Based on the unauthorized non-stormwater discharges described in Appendix B, including the November 2019 – June 2020 Violations described in Paragraph 94 and the July 2024 – November 2024 Violations described in Paragraph 95, Defendant failed to meet its obligation to eliminate unauthorized non-stormwater discharges as required by the 2015 MSGP and the 2021 MSGP.

Inadequate Control Measures to Minimize Discharges of Pollutants

98. Based on Defendant's November 2019 – June 2020 Violations, July 2024 – November 2024 Violations, among other violations as detailed in Appendix B, Defendant failed to select, design, install, and implement control measures to minimize the pollutants in stormwater and failed to minimize the potential for leaks, spills and other releases that may be exposed to stormwater, including through the use of secondary containment, as required under the 2015 MSGP and 2021 MSGP. *See* 2015 MSGP, Part 2.1; 2021 MSGP, Part 2.1.

Failure to Take Timely Corrective Actions

99. Based on Defendant's November 2019 – June 2020 Violations, July 2024 – November 2024 Violations, among other violations as detailed in Appendix B, Defendant failed to take both immediate and subsequent corrective actions, as required under the 2015 MSGP and the 2021 MSGP. *See* 2015 MSGP, Parts 4.3.1, 4.3.2; 2021 MSGP, Parts 5.1.3.1, 5.1.3.2.

100. Considering that Defendant's low-pH discharges are continuing to this day, Defendant has fallen far short of its obligation to take corrective action within 14 days, within 45 days if infeasible, or within the "minimum additional time necessary" if 45 days is infeasible. *See* 2015 MSGP, Part 4.3.2; 2021 MSGP, Part 5.1.3.2.

Inadequate SWPPP

101. Defendant failed to prepare and implement a SWPPP that meets the requirements of the 2015 MSGP and the 2021 MSGP.

102. For example, Defendant failed to include in its SWPPP an outfall from the Facility parking lot that discharged to the upstream access point in the Stream (the "Undisclosed Outfall"), which EPA discovered during an inspection of the Facility on May 29, 2025.

103. Defendant also failed to include the roof of the Vinegar Building in its SWPPP, even though this was an area of the Facility where industrial materials or activities were exposed to stormwater and where potential spills and leaks could occur that could contribute pollutants to stormwater discharges. Defendant reported to EPA that low-pH discharges to the Stream on at least three days—August 13, 2025, August 18, 2025, and August 21, 2025—resulted from the release of pollutants from the roof of the Vinegar Building. Defendant claimed that due to a pump failure, bacteria used in the

vinegar process turned into foam and was released from a tank onto the roof of the Vinegar Building by way of a transfer pipe. The foam liquified and flowed into the roof drains, down to the pavement and into CBY11, a catch basin located adjacent to the Vinegar Building, then into CBY17, and finally the Downstream Access Point.

104. Based on these omissions, Defendant violated the requirement in the 2015 MSGP and the 2021 MSGP to include in its SWPPP a site map with the locations of (a) all stormwater conveyances; (b) potential pollutant sources (c) significant spills or leaks; and (d) outfalls or discharge points. *See* 2015 MSGP, Part 5.2.2; 2021 MSGP, Part 6.2.2.3.

105. Defendant also failed to include in its SWPPP: (a) a description of areas of the Facility where industrial materials or activities were exposed to stormwater, including at the Undisclosed Outfall and the roof of the Vinegar Building; and (b) documentation of where potential spills and leaks could occur that could contribute pollutants to stormwater discharges, including at the Undisclosed Outfall and the roof of the Vinegar Building, as well as the discharge points that would be affected by such spills and leaks, including at the Undisclosed Outfall. *See* 2015 MSGP, Parts 5.2.3.1, 5.2.3.3; 2021 MSGP Parts 6.2.3, 6.2.3.3).

<u>Inadequate Annual Reports</u>

106. Defendant failed to submit Annual Reports that met the requirements of the 2015 MSGP and the 2021 MSGP, as Defendant's Annual Reports from 2019 through 2024 failed to include all incidents of noncompliance within the prior year or ongoing as of the reporting date, including all noncompliance related to Defendant's unauthorized stormwater and non-stormwater discharges to the Stream. *See* 2015 MSGP, Part 7.5; 2021 MSGP, Part 7.4.3.

### F. Defendant's Failures to Provide Information Under Section 308 of the CWA

107. Defendant failed to adequately respond to multiple information requests issued by EPA pursuant to its authority under Section 308 of the CWA, 33 U.S.C. § 1318(a).

108. EPA sent information requests to Defendant on March 3, 2025, March 21, 2025, and May 23, 2025 (together, the "2025 Information Requests"). The responses to the March 3, 2025, March 21, 2025, and May 23, 2025 were due on April 2, 2025, April 21, 2025, and June 23, 2025, respectively.

109. EPA's March 3, 2025 Information Request sought information from Defendant regarding its stormwater control measures, routine facility inspections, visual assessments of stormwater discharges, and shipments of liquid waste.

110. Defendant provided incomplete responses to some of the questions in the March 3, 2025 Information Request, including only partial records of routine facility inspections and visual assessments.

111. Defendant failed to answer other questions in the March 3, 2025 Information Request, failing to provide, for example, the volumes of liquid waste shipped to another entity each month since March 1, 2020.

112. EPA's March 21, 2025 Information Request sought information regarding low-pH discharges to the Stream that occurred in January 2025 and February 2025. Defendant identified the potential cause of its MSGP violations as overtopping and/or surcharging of the wastewater system and an inadvertent release from the wastewater pumphouse.

113. Defendant did not respond to any of the requests in the March 21, 2025 Information Request. Defendant failed to provide, for example, the total volume of materials that overtopped or surcharged from the wastewater system from January 20, 2025 to January 22, 2025, the total volume of materials that were released from tanks in the wastewater pumphouse from February 19, 2025 to February 27, 2025, or even the total capacity of Defendant's wastewater storage system, despite citing storage capacity issues as the cause of Defendant's MSGP violations in January 2025.

114. EPA's May 23, 2025 Information Request was a reissuance of the March 3, 2025 and March 21, 2025 Information Requests, with follow-up comments regarding Defendant's failure to respond.

115. Defendant failed to timely respond to any questions in the May 23, 2025 Information Request.

### G. Biological Impacts from Defendant's Discharges of Pollutants

116. Defendant's discharges of pollutants into the Stream have caused significant damage to the ecology of the Stream downstream from the Facility.

117. Defendant's discharges of pollutants have caused a decrease in the biodiversity of the Stream's benthic invertebrate community downstream from the Facility.

118. Defendant's discharges of pollutants have caused a decrease in the size of various invertebrate species' populations downstream from the Facility.

119. Defendant's discharges of pollutants have resulted in the presence of benthic fungus growth in the Stream downstream from the Facility, whereas no benthic fungus is present upstream of the Facility.

120. Defendant's discharges of pollutants have caused the influx of low-pH water from the Stream into the Souhegan River, which has negatively affected fish populations in that stretch of the Souhegan River.

## VI. LEGAL CLAIMS

### Count I: Unpermitted Discharge of Pollutants into Waters of the United States

121. Paragraphs 1 through 120 are realleged as though fully set forth herein.

122. On at least 1,728 instances since November 5, 2019, Defendant Old Dutch Mustard Co., Inc. d/b/a Pilgrim Foods discharged pollutants into waters of the United States without a permit authorizing it to do so.

123. Each such unpermitted pollutant discharge constitutes a separate violation of Section 301 of the Clean Water Act. 33 U.S.C. § 1311.

124. These violations are ongoing and will continue unless enjoined by this Court.

125. As a result of these violations, Defendant is subject to the imposition of permanent injunctive relief and civil penalties under CWA Sections 309(b) and (d), 33 U.S.C. §§ 1319(b) and (d).

### Count II: Permit Violations for Failure to Evaluate for and Eliminate Unauthorized Non-Stormwater Discharges

126. Paragraphs 1 through 125 are realleged as though fully set forth herein.

127. Since at least November 5, 2019, Defendant Old Dutch Mustard Co., Inc. d/b/a Pilgrim Foods has violated the 2015 MSGP and the 2021 MSGP, and continues to violate the 2021 MSGP, by failing to evaluate for and eliminate unauthorized non-stormwater discharges, in compliance with the requirements set forth in Paragraph 24, above.

128. Each violation of each of the requirements set forth in Paragraph 24, above, is a separate and distinct violation of the 2015 MSGP or the 2021 MSGP, and of the Clean Water Act, for each day on which the violation occurred and/or continued.

129. These violations establish an ongoing pattern of violations of the requirements of the 2015 MSGP and the 2021 MSGP that will, on information and belief, continue unless enjoined by this Court.

130. As a result of these violations, Defendant is subject to the imposition of permanent injunctive relief and civil penalties under CWA Sections 309(b) and (d), 33 U.S.C. §§ 1319(b) and (d).

**Count III: Permit Violations for Failure to Carry Out Required Stormwater Management Practices**

131. Paragraphs 1 through 130 are realleged as though fully set forth herein.

132. Since at least November 5, 2019, Defendant Old Dutch Mustard Co., Inc. d/b/a Pilgrim Foods has violated the 2015 MSGP and the 2021 MSGP, and continues to violate the 2021 MSGP, by failing to conduct required stormwater management practices and reporting in compliance with the provisions set forth in Paragraphs 25 through 29 of this Complaint.

133. Each violation of each of the requirements set forth in Paragraphs 25 through 29 is a separate and distinct violation of the 2015 MSGP or 2021 MSGP, and of the Clean Water Act, for each day on which the violation occurred and/or continued.

134. These violations establish an ongoing pattern of violations of the requirements of the 2015 MSGP and the 2021 MSGP that will, on information and belief, continue unless enjoined by this Court.

135. As a result of these violations, Defendant is subject to the imposition of permanent injunctive relief and civil penalties under CWA Sections 309(b) and (d), 33 U.S.C. §§ 1319(b) and (d).

**Count IV: Failure to Provide Information Under Section 308 of the CWA**

136. Paragraphs 1 through 135 are realleged as though fully set forth herein.

137. On April 2, 2025, April 21, 2025, and June 23, 2025, Defendant Old Dutch Mustard Co., Inc. d/b/a Pilgrim Foods violated Section 308(a) of the CWA, 33 U.S.C. § 1318(a), by failing to timely provide information to EPA as was reasonably required to implement Section 402 of the CWA, 33 U.S.C. § 1342.

138. Defendant failed to timely provide information to EPA as was reasonably required to implement Section 402 of the CWA, 33 U.S.C. § 1342.

139. Each violation of each of the requirements set forth in Paragraph 18, above, is a separate and distinct violation of Section 308(a) of the CWA, 33 U.S.C. § 1318(a), for each day on which the violation occurred and/or continued.

140. As a result of these violations, Defendant is subject to the imposition of permanent injunctive relief and civil penalties under CWA Sections 309(b) and (d), 33 U.S.C. §§ 1319(b) and (d).

## VII. RELIEF SOUGHT

Wherefore, Plaintiff, the United States of America, respectfully requests that the Court grant the following relief:

1. Order Defendant to comply with all applicable requirements of the Clean Water Act and its implementing regulations including the 2021 MSGP, and any subsequent permits issued to Defendant.

2. Order Defendant to pay civil penalties not to exceed $68,445 per day for each violation;

3. Award the United States all costs and disbursements of this action; and

4. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

ERIN CREEGAN
United States Attorney for the District of
New Hampshire

Dated: August 13, 2026

/s/ John G. Osborn
John G. Osborn
Special Assistant United States Attorney
District of New Hampshire
100 Middle Street, East Tower
Portland, Maine 04101
(207) 780-3257
john.osborn2@usdoj.gov

Samuel H. Martin
Assistant United States Attorney
United States Attorney's Office
District of New Hampshire

Of Counsel:

Tahani Rivers
Attorney Advisor
U.S. Environmental Protection Agency, Region 1
5 Post Office Square
Boston, MA 02109